### MOTOR VEHICLE LICENSE LAW INVALID.

Common Pleas Court of Franklin County.

CHARLES C. JANES AND THE OHIO STATE AUTOMOBILE ASSOCIA-
TION v. CHARLES H. GRAVES, SECRETARY OF STATE.

Decided, November 11, 1913.

*Constitutional Law—Act Providing for Registration of Motor Vehicles
Invalid—Discrimatory Provisions—Repair of Public Highways
Otherwise Provided for by General Law—Purpose of the Act One
of Taxation.*

1. The act providing for registration of motor vehicles (103 O. L., 763)
is discriminatory in its application, embodies double taxation, be-
trays an evident purpose to raise a fund for road and general state
revenue purposes under the guise of regulation, and is invalid
because not within the power of the Legislature, and because it
expressly violates Article XII, Section 2.
2. One purpose of the law is a police regulation for the welfare and
safety of the people. It is a registration law, not a license, being a
mere regulation of an admitted right. The primary purpose of
the law is overshadowed by a clear intent to impose a tax and
to raise revenue.

*H. L. Gordon* and *C. D. Saviers,* for plaintiffs.
*Timothy S. Hogan,* Attorney-General, contra.

KINKEAD, J.

This case is submitted by plaintiffs for a temporary restrain-
ing order to prevent the defendant as Secretary of State from
collecting any tax, license or fee under the provision of law
relating to registration of motor vehicles, 103 O. L., 763.

Defendant meets the application by demurrer to the petition
challenging the sufficiency thereof.

Plaintiffs contend that the law is unconstitutional on a num-
ber of grounds and therefore the assessment of the "registration
fee" therein provided is unwarranted. Petitioners ask that the
Secretary of State be enjoined from entering into contracts for
the manufacture of number plates, placards, printing of blanks,
books, etc.

It is contended that the law provides for a levy of a tax, and
not a license; that the number of motor vehicles or automobiles

in Ohio on November 15, 1912, was 62,956, and that the owners were required to pay $336,492.95; that the total cost of operating and maintaining the department for the year was $60,337.85, leaving a surplus of $276,155.10, and that under the present law it is proposed to collect an amount largely in excess of this sum. From January, 1913, to October 1, there was issued 84,500 certificates of registration for which there was collected the sum of $425,426, at a total expense of not to exceed $80,000, and it is alleged that under the new law for the year 1914 there will be collected a surplus amounting to more than a million dollars.

It is averred that a charge of one dollar for each motor or other license is fair and reasonable and sufficient to cover all cost of registration, and that the taking of more than that amount is taking property without due process of law.

An analysis of the law is essential to show its purpose, object, and the construction and meaning thereof.

Owners of a "motor vehicle" are required "annually" before the first day of January, to file an "application for registration" which shall contain a "brief description of the motor vehicle to be registered," the name of the manufacturer, the factory number, the number, the amount of the motive power, stated in figures or horse power, in accordance with the rating established by the association of licensed automobile manufacturers, and the name, residence and address of the owner of such motor vehicle.

The fee is $5 for each electric motor vehicle; $5 for each gasoline or steam motor vehicle having motive power of twenty horse power or less; $6 for each gasoline or steam motor vehicle having a motive power of more than twenty horse power and not more than thirty horse power; $9 for each gasoline or steam motor vehicle having a motive power more than thirty and not more than forty horse power; $12 for each gasoline or steam motor vehicle having a motive power of more than thirty and not more than fifty horse power; $15 for one having a motive power of more than fifty horse power, and not more than sixty horse power, and $18 for one having motive power of more than sixty horse power.

A full and correct list of registered motor vehicles and their owners is required to be furnished monthly to the clerk of each county in the state, which are to be kept as public records.

A distinctive number as an identification mark consisting of a placard containing the number of the motor vehicle is to be placed thereon.

Special provision is made for registration for manufacturers and dealers, and of chauffeurs.

The law provides:

"The revenues derived by registration fees provided for in this chapter shall be applied by the Secretary of State toward defraying the expenses incident to carrying out and enforcing the provisions of this chapter, and any surplus thereof shall be paid by him monthly into the state treasury. One-third of the revenues paid into the state treasury shall be used for the repair, maintenance, protection, policing and patroling of the public roads and highways of this state under the direction, supervision and control of the state highway department."

Penalties are provided for failure to comply with the regulations of the law as to tags, and other matters.

A penalty is prescribed for driving a motor vehicle without providing it with sufficient brakes to control it at all times, and a suitable bell or other device for signalling, or for failing to display a red light and three white lights.

The law provides that one-third of the revenues shall be used in the repair, maintenance, protection, policing and patroling of the public roads and highways under the supervision of the state highway department, leaving two-thirds thereof to be used by the state as part of the general revenue.

If there is a surplus of $1,000,000 after the Secretary of State defrays the expenses incident to carrying out and enforcing the provisions of the law, that would produce $333,333.33 for the use of the state highway department, while $666,666.66 would go into the general revenue fund for general state purposes.

An act passed April 8, 1913 (103 O. L., 155), provides for a levy of a tax of one-half of one mill on all the taxable property within the state, to be collected as other taxes due the state, the proceeds of which shall constitute the state highway improvement fund. Seventy-five per cent. of such fund is to be used for construction, improvement, maintenance and repair of an inter-

county system of highways and twenty-five per cent. for certain main-market roads.

The state highway department is created for "the purpose of affording instruction, assistance, and co-operation in the construction, improvement, maintenance and repair of the public roads and bridges of the state" (Code, Sec. 1178 *et seq.*). The state highway department act was amended 103 O. L., 449.

The state highway commissioner has "general supervision of the construction, improvement, maintenance and repair of all highways, bridges and culverts which are constructed, improved, maintained or repaired with or by the aid of state money" (Section 1183, 103 O. L., 450). He aids county commissioners and approves the design, construction, maintenance and repair of bridges and culverts; prepares plans, specifications, etc. He, with his deputies, shall designate by name and number the main roads, known as "inter-county highways." He receives application for state aid. Many other duties are imposed upon him, but nowhere is there any specific provision made for "protection, policing and patroling of the public roads and highways" as provided in the act in question, and for which, together for "repair and maintenance" one-third of the revenues paid into the state treasury by owners of motor vehicles is to be used.

Furthermore, Section 1222-1 of the state highway act (103 O. L., 485), provides:

"For the purpose of providing a fund for the payment of the proportion of the cost and expense to be paid by the county, the county commissioners are authorized to levy a tax not exceeding one mill upon all taxable property of the county, which is in addition to all other levies authorized by law."

A levy is authorized to be made to provide a fund to pay the share to be borne by the township.

The share to be paid by the state to carry out the provisions of the state highways act are appropriated for that purpose by the Legislature from the general revenue fund. Sections 1222, 1225.

By an act passed April 16, 1913 (103 O. L., 863), there shall be levied annually a tax of one-half of one mill on all the taxable property within the state, to be collected as other taxes due the state, and the proceeds of which shall constitute the state highway improvement fund.

.We find here then full and complete provision for a state levy to provide all the funds necessary to pay costs and expenses of the state highway department, as well as the share of the state in construction, maintenance and repair of roads in pursuance of its provisions.

By the provisions of the act under consideration there is to be paid into the state treasury to be used for the "repair, maintenance, protection, policing and patroling of the public highways under the direction, supervision and control of the state highway department" for the year 1914 from the "revenue" derived from fees paid by automobile owners, probably $333,333.33 being one-third the amount paid.

As no provision is made by law for the actual "policing and patroling of the public highways," and as there is probably no necessity therefor, the conclusion is imperative that the purpose of the law is to thus provide a fund for the "repair" and "maintenance" of the public highways, which is in addition to that already provided by law, viz., by Section 6859-1, General Code (103 O. L., 863), which provides for a specific state levy to constitute the state highway improvement fund for the express purpose of paying the state's share of improving roads under the state highway improvement law.

This discussion of the road improvement laws is for the purpose of shedding light on the meaning and intent of the motor vehicle registration law. It clearly shows how the motor vehicle law which raises so large a surplus, discriminates the class of persons owning the same, constituting the law double taxation.

Full and adequate provision has been made for the levy of state, county and township tax and assessment for the construction, maintenance and repair of roads, state, county and township.

The primary purpose of the motor vehicle law is to provide a system of state registration of motor vehicles by the owners thereof for the benefit and protection of the citizens of the state, counties, townships, villages and cities. The design is to enable those who may be injured by the negligence of drivers of such vehicles to be able to place the responsibility upon the proper persons. It is to facilitate the police regulation concerning such vehicles within villages and cities. There would be some sense in distributing a surplus to the corporate bodies whose function

is to enforce the police regulation. Even then it should not be more than is necessary.

Laws and ordinances have been passed regulating the speed which could not well be enforced without a system of registration such as we have.

The enforcement of the police regulation of the law is left to the local authority. If an owner of such vehicle fails to register, or fails to have the number and registration mark furnished by the Secretary of State displayed as required, he may be fined by the police court not more than $50. So if he fails to have suitable brakes, bell or device for signalling, or fails to have the required lights displayed, he may be fined by the police court not more than $25.

The only service rendered by the Secretary of State in the matter of the police regulation as to registration is the receipt of the application, the issuance of the tax or placard, the keeping of a book or index of the names of the persons so registered, and furnishing the same monthly to the county clerks.

The primary purpose and design of the enactment is police regulation, and if sustained, it must be sustained as a pure and simple regulation. And the question arises whether any of its provisions are such as to make it something more than a police regulation.

It is contended that the fees now exacted converts it into a revenue measure. It is argued that because for the year ending November 15, 1912, owners of motor vehicles were required to pay $336,492.95, while the total cost of operating and maintaining the department for the year was but $60,337.85, thus creating a surplus of $276,155.10, and because under the increased fees the net surplus will be in the neighborhood of $1,000.000, the act passes the point of mere regulation, and is converted into a revenue measure.

On this point the present law should be compared with the former law. The original law is found in the General Code, at Sections 6290-6310. Under that law, Section 6294, a registration fee of $5 was required of an owner of each gasoline or steam motor vehicle, and a fee of $3 for each electric vehicle.

The revenues, by Section 6309, were to be used in defraying the expenses incident to carrying out and enforcing the law, the remainder beng paid into the treasury. ''All such moneys com-

ing into the state treasury shall be a separate fund for the im-provement, maintenance and repair of the public roads and highways of this state, and be apportioned as the state highway fund is apportioned." This act was passed 99 O. L., 538.

The term "motor vehicle" as used in the act, includes all vehicles propelled by power other than muscular power, except motor bicycles, motorcycles, road rollers, traction engines, am-bulances, etc. Section 6290, 103 O. L., 763.

When Section 6294 was passed fixing the fees of $5, $6, $9, $12, $15, $18, according to the horse power of the motor vehicle, and Section 6309, providing that the "revenues" derived by registration fees, one-third thereof should be used for the repair and maintenance of the roads, were amended April 28th, 1913, it is to be presumed that the Legislature had in mind the amount of revenue whch had been derived under former Section 6294, where the fee was $5 without distinction as to horse power.

No one can reasonably contend that the cost of registration of a motor vehicle with a horse power of more than sixty is greater than that of one of twenty horse power or less.

There can be no other rational presumption than that the pur-pose of the increased fee, and the change giving the state high-way improvement fund but one-third of the revenues paid into the state treasury, was to add two-thirds of such surplus to the general revenue fund of the state.

The plain purpose of the amended act, in the light of knowl-edge of the large surplus which came into the hands of the state highway fund, was to increase the general revenue of the state to the extent of the two-thirds of such surplus.

Courts still approach questions of validity of legislative enact-ments in the spirit of the framers of the organic law, who clearly intended that the judicial power was to be used to declare the law, whether it be a question of common law, of statutory or constitutional law. The duty is to be performed without a quak-ing fear of criticism of those reviving the school of thought which was maintained by some a hundred and more years ago, when it was sought to impeach judges for declaring laws uncon-stitutional. The fact that a constitutional amendment places a limitation upon the power of the court of last resort to invalidate law may only serve as a reminder to inferior courts of the funda-mental principle that laws are not to be declared unconstitu-

tional unless clearly so; that if two constructions are possible, one of which will validate the law while the other will invalidate it, that construction will be adopted which will sustain the law. But this principle must not be pressed so far as to amount to an abdication of the functions of the court to declare the law.

The supreme law of the land is the Constitution made by the voice of the people. It declares the powers of and limitations upon the legislative power, as well as that of the judiciary.

When the Legislature passes a law which is beyond its power because it clearly and distinctly conflicts with a specific provision of the supreme law of government as embodied in the written Constitution, the supreme law must stand and be maintained, while the pretented law passed by the legislative agents of the people must fall. The power of the agents can not rise higher than that of the people. The courts who are empowered to declare the law must merely declare and enforce the supreme will of the people. If they did not, who would, and what would happen? This power is expressly delegated, not assumed. If the Legislature were permitted to act without regard to constitutional limitation, the voice of the people would not be supreme. And if it were within the exclusive province of the Legislature to say when it acted within its power under the Constitution, it would be to accord to itself judicial power, which is in fact exclusively conferred upon the judiciary, and would make legislative enactment superior to constitutional law.

In passing the law in question has the Legislature acted within or beyond its power?

The exclusive power to assess a tax, a license tax, or to provide for a license is vested in the Legislature. The power to tax to provide for the raising of a revenue is not expressly conferred by written Constitution, but is inherent in the government and is exclusively vested in the legislative branch of government by common law. The same is true of the right to impose and exact a license tax. The same is true of the right to provide for the grant of a license. But the purpose and source of the power to impose a license tax or to exact a license is wholly different from the power to tax.

The inherent power to tax is to be exclusively exercised for the express and sole purpose of raising revenue to defray the expenses of government. In pursuance of this power the Legisla-

ture may provide in addition to the imposition of a tax for governmental expense, the levy of assessments for the making of internal public improvements imposing such assessments upon landowners specially benefited thereby.

Both the power to tax and to levy an assessment has been exercised for the construction, maintenance and repair of public roads. The statutes of the state already provide for the tax to be levied which is. to be borne by the people in general as their share of the improvements, while the special assessment is levied upon adjacent property owners according to special benefits.

Under the new scheme contemplated by the state highway department by Section 6859-1 (103 O. L., 863), all the people of the state contribute their proportionate share to the tax of one-half of one mill on all taxable property.

Section 5635 provides for the levy by the county commissioners for taxes for county road and bridge purposes, and Section 7499 provides for special levy on lands for certain distance on each side of a road, for road purposes.

The only way by which a fund can be raised for road purposes is by a uniform method of tax upon the taxable property of the state. A revenue for the purpose of maintenance and repair of public roads can not be otherwise made than by the levy of tax; it can not be done under the guise or form of a regulation fee imposed upon a certain or particular class of users of public roads on the theory that such class use the road in a more burdensome manner. In the winter season there is one class of vehicles which no doubt exclusively use the roads, while the motor vehicles use them to great extend at the warmer seasons. This act imposes a fee which for one year produced $336,492.95 and $276,155.10 was paid into the state treasury to be spent on the roads. The amended act it is claimed will produce a surplus over the operating expenses of the department of $1,000,000, one-third of which is to be spent on the roads, while two-thirds is to be used for the general expenses of the state government. All other vehicle owners are to pay nothing beyond their ordinary taxes.

Does not the bare statement of the facts plainly and unequivocally demonstrate that the fees exacted have passed the boundaries of mere regulation into the field of taxation. The

fee of registration is no doubt greater in hundreds of cases than the tax assessed upon the value of the motor vehicle.

The object of the law is regulation of motor vehicles which endanger person and property, moving rapidly along the highway, and but for the registration there would be no redress for injuries done.

The amount of fee exacted, and the disposition of the "revenue" derived therefrom, disclose a manifest purpose to raise money by way of revenue for two purposes; one to expend on the roads of the state, the other to add to the general revenue of the state. No one can read the law without being so impressed. The purpose is to create a fund. And it matters not how much it may be claimed that the contribution for the benefit of the road is to be considered as a highly meritorious and useful purpose, the fact remains that it is unjust, discriminatory and destructive of the principle of equality.

The manifest purpose to add to the general revenue of the state can not appeal to one's sense of justice in the slightest degree. Increasing the fees by graduation according to the horse power and taking two-thirds of the fund for general revenue purposes is the plainest kind of effort to seize the opportunity for raising the fees for purposes of revenue.

Even the provision imposing such a burden on the owners of vehicles, as to produce a fund of $276,155.10 beyond the expense of operating the department to be used in the maintenance and repair of the roads is a species of unjust and discriminatory taxation, destructive of the principle of equal burdens and taxation. This is so because such owners already are subjected to their shares of all road tax provided by law.

The act in question does not impose a license tax. For a license tax is imposed on a business or occupation merely for the purpose of raising revenue. *In re Guerrero,* 69 Cal., 88; *Schmidt* v. *Indianapolis,* 168 Ind., 631; *Kansas City* v. *Grush,* 151 Mo., 128; *Ellis* v. *Frazier,* 38 Ore., 462; *Matthews* v. *Jensen,* 21 Utah, 207.

A license is merely the permission or authority to do some act. A license is a privilege, granted by competent authority, to do that which would be unlawful without such privilege. *State* v. *Hipp,* 38 O. S., 199, 226; *Anderson* v. *Brewster,* 44 O. S., 576; *Wilkie* v. *Chicago,* 188 Ill., 444 (80 Am. St., 182).

"The thing to be done may be something lawful in itself and only prohibited for the purposes of the license; that is, prohibited in order to compel the taking out of a license." *State* v. *Hipp*, 38 O. S., 199 (the law itself is the license); *Hubman* v. *State*, 61 Ark., 482, 489.

"A license being in the nature of a privilege, it would be a strange incongruity to grant to one a privilege of bearing the burden of a tax. * * * The two things are entirely distinct in their characteristics. The license may exist without the imposition of a tax, and the tax may be imposed without the granting of a license." *Anderson* v. *Brewster*, 44 O. S., 576, 588.

The power to license certain classes of business is to impose a charge in the form of a tax, and enforce the payment of the tax as a condition to the lawful prosecution of the business. 38 O. S., 225; 1 O. S., 268; 11 O. S., 534. This relates only to employments which in one form or another, impose burdens upon the public. Such tax can not be imposed merely for general revenue, for the only mode of raising such revenue is found in the twelfth article in the Constitution. 38 O. S., 225; 5 O. S., 243, 589; 18 O. S., 237.

It could not be employed as a mode of taxing property, without reference to the uniformity and equality required in Section 2 of Article XII of the Constitution. *Baker* v. *Cincnnati*, 11 O. S., 534.

"A license is issued under the police power of the authority which grants it. If the fee required for the license is intended for revenue, its exaction is an exercise of the power of taxation." *State* v. *Hipp*, 38 O. S., p. 226.

Motor vehicles impose a burden on the public different from other vehicles in that there is greater danger from injury to persons therefrom. The licensing of automobiles is considered a valid exercise of the police power. *Conklin Lumber Co.* v. *Chicago*, 127 Ill. App., 103; *Umven* v. *State*, 73 N. J. L., 529.

"A license fee should be such a sum of money as will compensate for the expense of issuing the license certificate and for the probable expense of regulating and controlling the operation of the automobile licensed." *Van Hook* v. *Selma*, 70 Ala., 361 (45 Am. Rep., 85); *Jacksonville* v. *Ledmth*, 26 Fla., 163 (9 L. R. A., 69); 23 Am. St., 558; *Price* v. *People*, 193 Ill., 114 (86 Am. St., 306); *Littlefield* v. *State*, 42 Neb., 223 (28 L. R. A., 588; 47 Am. St., 697); *Baker* v. *Cincinnati*, 11 O. S., 534; *Berry, Automobiles*, Section 84.

"Anything in excess of an amount which will defray such necessary expense can not be imposed under the police power, because it then becomes a revenue measure." *Berry, Autos,* Par. 84; *In re Guerrero,* 69 Cal., 88; *Schmidt* v. *Indianapolis,* 168 Ind., 631; *Kansas City* v. *Grush,* 151 Mo., 128; *North Hudson R. Co.* v. *Hoboken,* 41 N. J. L., 71; *New York* v. *Second Ave. R.,* 32 N. Y., 261.

A license fee of $2 for registration of an automobile is reasonable. *Com.* v. *Boyd,* 188 Mass., 79. Likewise a fee of $1. *Umven* v. *State,* 73 N. J. L., 529.

"What is a reasonable fee must depend largely upon the sound discretion of the Legislature, having reference to all the circumstances and necessities of the case. It will be presumed that the amount of the fee is reasonable unless the contrary appears upon the face of the law itself, or is established by proper evidence." *Berry,* Section 84; *Gamble* v. *Montgomery,* 147 Ala., 682; *Atkins* v. *Phillips,* 26 Fla., 281 (10 L. R. A., 158); *Spiegler* v. *Chicago,* 216 Ill., 114; *Iowa City* v. *Newell,* 115 Ia., 55; *State* v. *Snowman,* 94 Me., 99 (50 L. R. A., 544; 80 Am. St., 380); *Willis* v. *Standard Oil Co.,* 50 Minn., 290; *Littlefield* v. *State,* 42 Neb., 223 (28 L. R. A., 588; 47 Am. St., 697); *Oil City* v. *Trust Co.,* 11 Pa. Co. Ct., 350.

"In determining whether a fee required for a license is excessive, the absence or amount of regulatory provisions and the nature of the subject of regulation should be considered, and if the amount is wholly out of proportion to the expense involved, it will be declared a tax." *Berry,* Section 84; *Ex parte,* 141 Cal., 204, 206.

If revenue is incidentally derived which is not so disproportionate as to make the fee charged unreasonable, there can be no objection. *Berry, Auto.,* Section 86, and cases cited. See *State* v. *Hudson,* 78 Mo., 302.

It is held, however, that the law expressly directs that the fund derived from the license fee shall be used for purposes other than defraying the expenses of issuing the license and of regulation, that it thereby makes of the fee a tax, and converts what was intended to be a police measure into a revenue law. *Berry,* Section 87; *Chicago* v. *Collins,* 175 Ill., 445 (49 L. R. A., 408; 67 Am. St., 224); *Livingston* v. *Paducah,* 80 Ky., 656; *Ellis* v. *Frazier,* 38 Oreg., 462.

Thus it was declared that an ordinance imposing a license fee on vehicles and providing that the money so derived should be held as a special fund for improving the city streets, created

a double tax, which rendered it invalid, the same vehicles having been taxed for general purposes, at their value, as personal property. Such a rule clearly shows how discriminating it is to accumulate a large surplus from a registration fee to improve the roads. People may be willing to stand it, but that does not add to the lawfulness of the law. *Id., Chicago* v. *Collins,* 175 Ill., 445, etc., cited above.

In this case the demurrer admits the accumulation of a large surplus into a fund, a part of which goes to the general state road fund, but two-thirds of it is to be used as part of the general revenue fund of the state.

The great amount of surplus above the cost of operating the department and the use to which it will be put, there being absolutely no police regulation further than the list of owners with the numbers of the vehicles, renders the imposition so wholly and palpably unreasonable as to invalidate the law because it is an imposition of a tax instead of a license.

But there is another view to be taken of the law. Motor vehicles are a lawful means of locomotion on the highways. Owners of such vehicles have the same rights as other vehicles. Not only are these rights recognized and enforced by the courts, but by statutes as well. *Berry, Auto.,* Section 18; *House* v. *Cramer,* 134 Iowa, 374 (10 L. R. A. [N. S.], 655).

The right to travel in the highways by means of motor vehicles is as much within the right of the owners thereof as it is in the owners of any other kind of vehicle. The right of the public to use the highways and streets for purposes of travel is the right to use them in the recognized methods in which the public highways are used.

A license being regarded as a privilege can not possibly exist with reference to something which is a right, free and open to all, as is the right of the citizen to ride over the highways by motor vehicle, or horse vehicle in a reasonable manner. *Chicago* v. *Collins,* 175 Ill., 445 (67 Am. St., 224).

Strictly speaking, the law under consideration in this case is not a license law. It distinctly recognizes the right of owners to use the highways, because it says nothing about such right. The law is just what it purports to be; it is a registration law. The only penalty prescribed is a fine, if the tag or placard containing the registration number and mark is not displayed on

the front and rear of the motor vehicle as an identification mark, securely fastened so as not to swing. It is a police regulation wherein there is an attempt to create revenue under the guise of police regulation, which is so palpable and clear as to render it invalid because not within the power of the Legislature to enact. The Constitution not authorizing the Legislature to thus raise a revenue, either for the improvement of roads, or for general state revenue, it is the province and duty of the court expressly required of it by the Constitution to declare the law as found in the Constitution, and to declare the act invalid. *Mugler* v. *Kansas*, 123 U. S., 623, 661.

As stated by the Supreme Court, the authority to tax is regulated by Section 2 of Article XII of the Constitution, which provides that laws shall be passed, taxing by a uniform rule all real and personal property.

The clear purpose of the amount exacted from owners of motor vehicles by the law in question is to produce a fund for road purposes and for general revenue purposes under the guise of regulation, which makes it a tax and destroys the uniformity of taxation fixed by the Constitution. The obvious purpose of the amendment increasing the fees according to horse power, and leaving two-thirds of the surplus in the general revenue fund, was to increase that fund. There is no more trouble or expense in registering a motor vehicle of twenty horse power than in one sixty, and there can be no purpose whatever in that graduated fee, except increased revenue, because there is absolutely no different purpose to be subserved in registering a motor vehicle of sixty horse power and one of twenty. The registration has an object and purpose as before pointed out, which is the same as to any horse power. The graduated fee according to the horse power is a mere guise or subterfuge to obtain the increased revenue.

The act being clearly a tax measure, it constitutes double taxation, and is in direct conflict with and unauthorized by Article XII, Section 2 of the Constitution.

The law is unconstitutional and invalid. The demurrer to the petition is overruled; the petition states a good cause of action.

A temporary injunction is allowed as prayed for upon giving a bond in the sum of $500.